**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| WALSH CONSTRUCTION COMPANY II, LLC, | |
| Plaintiff, | No. 22 CV 6842 |
| v. | Judge Thomas M. Durkin |
| LEXINGTON INSURANCE COMPANY, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Walsh Construction Company II, LLC ("Walsh") brings this insurance coverage action against Lexington Insurance Company ("Lexington"), alleging breach of contract and violation of the Illinois Insurance Code, 215 ILCS 5/155 *et seq.* Before the Court are Lexington's motion for summary judgment, R. 33, and Walsh's motion to exclude Lexington's expert, R. 41. For the following reasons, Walsh's motion is denied and Lexington's motion is granted in part and denied in part.

## Background

The following facts are taken from the parties' Local Rule 56.1 submissions, the materials cited therein, and other aspects of the record in this case.[1] All facts are undisputed unless otherwise noted.

---

[1] Walsh argues that Lexington's statement of material facts violates Local Rule 56.1 because it exceeds the 80-paragraph limit. The Court previously denied Walsh's motion to strike on this basis. *See* R. 61. Walsh further argues that Lexington is offering additional facts by attaching the expert reports of Rachel Domingo without citations in the Rule 56.1 statement to those reports. Although courts have stricken Rule 56.1 statements for failing to accurately cite evidence, Walsh provides no legal basis to strike a Rule 56.1 statement that does not include citations to expert reports

The Metropolitan Water Reclamation District's ("MWRD") Des Plaines tunnel project is a decades long program involving the construction of deep tunnels for the purpose of collecting excess storm water run-off and sewage overflow, which is called combined sewage overflow ("CSO"). These tunnels collect CSO so that it can be stored in reservoirs and later pumped out and treated at treatment plants.

The McCook Reservoir Tunnel Project (the "McCook Project") is the last piece of the MWRD's Des Plaines project. Below is an aerial view of the McCook Project.



The teal-colored line in the upper left-hand corner, with the "T.A.R.P." descriptor, is the preexisting Des Plaines Inflow Tunnel (the "Des Plaines Tunnel"). On the far right-hand side, to the right of Interstate 55, is the McCook Reservoir. The McCook Project's purpose is to transport the CSO from the Des Plaines Tunnel into the McCook Reservoir. Walsh was the general contractor hired by MWRD to construct the underground tunnel depicted by the blue line (the "Walsh Tunnel"). Walsh's scope

---

that are included on summary judgment. In any event, strict compliance with Rule 56.1 is discretionary. *See Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 537 (7th Cir. 2011).

of work included: constructing a gate shaft, depicted by the middle red circle, with steel gates that would control the flow of CSO passing through the Walsh Tunnel; lining the gate shaft and Walsh Tunnel with concrete; and eventually making the live connection between the Des Plaines Tunnel to the McCook Reservoir through the Walsh Tunnel.

At the end of the Des Plaines Tunnel, there was a preexisting Dome Bulkhead (the "Dome"), depicted above in light green. The Dome is an eighteen-foot-thick[2] cement barrier that prevented CSO from entering the Walsh Tunnel from the Des Plaines Tunnel and kept the Des Plaines Tunnel acting as an enclosed system. There were also two "rock plugs" in the Walsh Tunnel, depicted in lavender. One separated the Walsh Tunnel from the McCook Reservoir, and the other was located just south of the Dome. The purpose of the rock plugs was to withstand water pressure from the other side during excavation.

I.      The Policy

Lexington issued an all-risk insurance policy for the McCook Project effective August 1, 2016 through January 11, 2020 (the "Policy"). The Policy insures against "all risks of direct physical loss of or damages to insured property while at the location

---

[2] Lexington objects to Walsh's Exhibit 4 as hearsay, which is an article that states that the Dome is eighteen feet thick. Walsh responds that Exhibit 4 is admissible under Federal Rules of Evidence 201(b) and 803(8)(B). At this time, without further argument, the Court does not believe the article is admissible under these Rules. But there is no genuine dispute that the Dome is a thick structure that was meant to keep CSO within the Des Plaines Tunnel as an enclosed system. The exact thickness is immaterial to decide the pending motions.

of the **INSURED PROJECT\*** . . . within the policy territory and occurring during the term of this policy." R. 1-1 at 10, ¶ 1. The property insured includes:

> All materials, supplies, equipment, machinery, and other property of a similar nature, being property of the Insured or of others for which the Insured may be contractually responsible . . . all when used or to be used in or incidental to the demolition of existing structures, site preparation, fabrication or assembly, installation or erection or the construction of or alteration, renovation, rehabilitation of the **INSURED PROJECT\***.

R. 1-1 at 10, ¶ 2.A.

The **INSURED PROJECT\*** is defined as "the work which the Insured is contractually obligated to perform in accordance with the contract documents" for the McCook Project. R. 1-1 at 19, ¶ 5. The Policy further describes the **INSURED PROJECT\*** as the "[c]onstructions of a 20-foot diameter concrete lined connection funnel [sic] from the existing Des Plaines Tunnel System to the McCook Reservoir including a gate shaft, primary gate, backup gate, gate control building, temporary construction access shaft . . . ; demolition of existing concrete tunnel plug;[3] [and] making a live connection to the operational Des Plaines Tunnel System[.]" R. 1-1 at 8, ¶ 8.

The Policy provides payment for any one **OCCURRENCE\***. *See* R. 1-1 at 7, ¶ 6.A. With respect to a **FLOOD\***:

> **OCCURRENCE\*** means all losses arising during a continuous period of seventy-two (72) hours during the term of this policy insofar as the limit of liability, sublimit of liability, aggregate limit of liability and the deductible provisions of the policy are concerned. . . . Such . . . **FLOOD\*** . . . shall be deemed to be a single **OCCURRENCE\*** within the meaning of this policy.

---

[3] This is the Dome.

R. 1-1 at 19, ¶ 8. A **FLOOD\*** is defined as:

> whether natural or manmade, flood waters, surface water, waves, tide or tidal water, overflow or rupture of a dam, levy, dike, or other surface containment structure, storm surge, the rising, overflowing or breaking of boundaries of natural or manmade bodies of water, or the spray from any of the foregoing, all whether driven by wind or not. A tsunami shall not be considered a **FLOOD\***.

R. 1-1 at 18, ¶ 4.

The Policy also provides coverage for Expediting Expenses and Extra Expenses:

> **(1) EXPEDITING EXPENSE**
>
> Subject to the SUBLIMIT OF LIABILITY stated under paragraph 6.B.(5) of the DECLARATIONS, in the event of direct physical loss or damage insured hereunder and occurring during the policy period, the Company will pay for the reasonable extra costs to make temporary repairs and to expedite the permanent repair or replacement of the insured property which is damaged by an insured peril, including additional wages for overtime, night work, and work on public holidays and the extra costs of express freight or other rapid means of transportation.
>
> **(2) EXTRA EXPENSE**
>
> Subject to the SUBLIMIT OF LIABILITY stated under paragraph 6.B.(6) of the DECLARATIONS, in the event of direct physical loss or damage insured hereunder and occurring during the policy period, the Company will pay for the reasonable and necessary Extra Expense which is incurred by the Insured for the purpose of continuing as nearly as practicable the scheduled progress of undamaged work, but only when such scheduled progress is impaired by direct physical loss or damage by an insured peril to the insured property.
>
> (a)   "Extra Expense" shall be defined as the excess costs over and above the total costs that would normally have been incurred to continue the scheduled progress of the undamaged work in the absence of insured loss or damage.

(b)     "Extra Expense" shall include reasonable and necessary labor, supervision, management and administration costs, equipment rental, temporary use of property and demobilization and remobilization of equipment and facilities, all when necessarily incurred to reduce time delays in the contract schedule.

It is a condition precedent to recovery hereunder that the Named Insured shall use due diligence and shall do and concur in all things necessary to maintain the scheduled progress of the undamaged work which existed immediately prior to insured loss or damage covered by this Policy.

R. 1-1 at 11, ¶ 3.C.(1)–(2). The amounts covered for Expediting Expenses and Extra Expenses per **OCCURRENCE\*** are limited to either $2,500,000 or "25% of the amount of insured physical loss or damage to Covered Property, whichever is less[.]" R. 1-1 at 7, ¶ 6.B.(5)–(6).

II.     December Flood

In late-December 2018, after Walsh had begun removing the rock plug on the reservoir side, CSO from the McCook Reservoir overflowed into the Walsh Tunnel (the "December Flood"). As a result, Walsh submitted an insurance claim to Lexington (the "McCook 2 Claim"),[4] wherein Walsh claimed property damages consisting of the cost of cleaning the Walsh Tunnel and replacing equipment. Walsh also submitted a claim for Expediting Expenses. Lexington paid Walsh for the property damages, but denied payment for the Expediting Expenses.

III.    February Flood

In January 2019, Walsh removed the rock plug in front of the Dome. On

---

[4] The parties refer to the insurance claims as McCook 2 and McCook 3, so the Court does the same.

February 1, 2019, Joseph Frascotti, an AIG[5] Senior Consultant Specialist and Engineer, visited the McCook Project to evaluate site conditions within the Walsh Tunnel for the benefit of Lexington's underwriters. During his visit, Frascotti took a picture of the Dome. His written report mentioned nothing about observing CSO leaking through the Dome or any holes in the Dome.

On February 2, 2019, CSO levels in the Des Plaines Tunnel began to rise (the "February Flood"). That evening, Walsh workers observed seepage of CSO on the face of the Dome. Walsh's superintendent, Mark Duncan, decided to evacuate the Walsh Tunnel due to safety concerns. Duncan was one of the last people to leave the Walsh Tunnel. At his deposition, Duncan testified that he observed CSO seeping through the Dome but did not see any rupture on the Dome. Between February 2019 and May 2019, no one reentered the Walsh Tunnel. Walsh's Project Manager Brian Fidoruk testified that Walsh's dewatering pumps continually pumped out water from February to May. On May 13, 2019, after two weeks of heavy rain, Walsh workers could look down the shaft leading into the Walsh Tunnel and see that the Walsh Tunnel was filled with CSO.

Walsh did not reenter the Walsh Tunnel until summer of 2019 when CSO levels subsided. Upon reentering the Walsh Tunnel, workers saw a hole near the bottom of the Dome. Once Walsh cleaned and sanitized the Walsh Tunnel and its equipment, Walsh decided to reinforce the Dome. After the reinforcement was

---

[5] The parties do not clarify the relationship between Lexington and AIG, but the Court assumes Lexington is an AIG company.

completed in October 2019, Walsh completed the tie-in work by lining the Walsh Tunnel and the gate shaft with concrete. The gates were delivered on May 19 and June 17, 2021.

As a result of the February Flood, on May 15, 2019, Walsh submitted an insurance claim to Lexington (the "McCook 3 Claim"). Lexington paid Walsh for the labor and costs associated with cleaning the Walsh Tunnel and utility repair. However, Lexington denied Walsh's claimed losses associated with reinforcing the Dome and further denied Walsh's claim for Extra Expenses and Expediting Expenses. Walsh filed this lawsuit against Lexington alleging breach of contract for failure to pay: the Dome's reinforcement costs (Count II); the McCook 2 and 3 Claims' Expediting Expenses (Counts I and III); and the McCook 3 Claim's Extra Expenses (Count IV). Walsh also alleges that Lexington acted in bad faith when partially denying the McCook 3 Claim (Count V). Lexington now moves for summary judgment on all counts and Walsh moves to exclude Lexington's expert's reports and declaration.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887,

8

894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Discussion

### I.      Rachel Domingo

The Court first addresses Walsh's motion to exclude the declaration and expert reports of Rachel Domingo. Walsh argues that Domingo's declaration and reports should be excluded because: (1) her testimony is irrelevant and her opinions are not tied to the Policy's language nor the facts of the case; and (2) they are inadmissible. The Court takes these in turn.

#### A.      Expert Testimony

Under Federal Rule of Evidence 702, a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" may testify as an expert if the proponent shows that it is more likely than not that: (1) the witnesses' expertise "will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) "the testimony is based on sufficient facts or data;" (3) "the testimony is the product

9

of reliable principles and methods;" and (4) the opinion "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019). "[T]he district court is a 'gate-keeper' who determines whether proffered expert testimony is reliable and relevant." *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 749 (7th Cir. 2006) (citation omitted). The Court's primary concern is "the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993).

Additionally, expert testimony must be tied to the case's facts and issues. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). Expert testimony that "does not relate to any issue in the case is not relevant, and . . . non-helpful." *Daubert*, 509 U.S. at 591; *see also* Fed. R. Evid. 402. A court should not exclude expert testimony that speaks on a relevant issue that the factfinder must decide. *See* Fed. R. Evid. 702; *cf. Hartman v. EBSCO Indus.*, 758 F.3d 810, 819 (7th Cir. 2014) (excluding testimony as unhelpful because expert's opinion did not assist the jury in deciding causation).

Here, Domingo's testimony is relevant and tied to the facts of the case. When Lexington first received Walsh's claims, it retained Domingo to perform a schedule analysis and evaluation of the alleged costs relating to the McCook 2 and 3 Claims.

10

On August 10, 2022, Domingo issued a report which concluded that delays in the project were driven by delays in the fabrication of the gate system rather than the Floods. R. 34-1 at 718. Based on this analysis, Lexington ultimately denied Walsh's Expediting and Extra Expense claims. After this lawsuit was filed, Domingo was retained as an expert and issued an expert report on November 9, 2023, largely adopting and affirming her August 10, 2022 report. *See* 34-1 at 720–33. Domingo was then deposed in her capacity as an expert witness on January 26, 2024. *See* R. 41-1. Because Domingo's opinion directly informs why Lexington denied the claims, it is undoubtedly relevant to the issues in this case.

Walsh further contends that Domingo's declaration and report should be excluded because her opinions are not tied to the terms of the Policy. Specifically, Walsh argues that Domingo's analysis is tied to the project's completion date instead of the construction schedule in place at the time of the alleged loss, as required by the Policy. However, Domingo is opining on whether Walsh actually incurred the costs claimed and whether either Flood actually caused the alleged Expediting Expenses and Extra Expenses. Domingo's failure to ground her opinions in the Policy language does not mean her testimony is irrelevant or unhelpful to the factfinder; indeed, it is relevant to causation.

Walsh also disagrees with Domingo's determination that in the absence of either Flood, Walsh would have had months of downtime due to delays unrelated to the Floods, such that Walsh did not incur Expediting Expenses or Extra Expenses.

11

But Walsh's disagreement with Domingo's conclusion is not a basis for exclusion, it is a basis for cross-examination.

      B.     Admissibility

Next, Walsh argues that the Court should not consider Domingo's declaration or expert reports because they are inadmissible hearsay. Expert reports and declarations, themselves, are generally not admissible at trial. *See Sommerfield v. City of Chicago*, 254 F.R.D. 317, 328–29 (N.D. Ill. 2008). But courts may consider sworn expert reports or declarations at summary judgment. *See, e.g., Scott v. Edinburg*, 346 F.3d 752, 759–60 (7th Cir. 2003) (finding expert report inadmissible on summary judgment where it was submitted without any supporting affidavit); *Hassett v. United Airlines, Inc.*, No. 23 C 14592, 2025 WL 3268667, at *4 (N.D. Ill. Nov. 24, 2025) (overruling hearsay objection to expert report on summary judgment because it was submitted with an affidavit and reflected the testimony the expert would give at trial); *Allen v. Benton*, No. 18-cv-4047, 2022 WL 18147674, at *4 (N.D. Ill. Feb. 25, 2022) ("A party who wants to rely on an expert report at the summary judgment stage must come forward with an affidavit or declaration from the expert. . . . *That's* testimony.") (emphasis original). Domingo's declaration summarizes her reports, her reports are sworn to in her declaration, and the reports reflect what she would testify to at trial. Thus, they may be considered at this stage.

Walsh further contends that Domingo's declaration offers facts without record cites and is inconsistent with her testimony at her deposition. But Domingo states that she "reviewed documents provided by Walsh during the claim adjustment and

additional documents produced in this litigation," and that the documents she considered are identified in the footnotes of her Rule 26 expert report. R. 34-1 at 679, ¶ 13. Therefore, Domingo's reports and declaration are based on facts or data in the case. *See* Fed. R. Evid. 703. And although Domingo was unclear at her deposition about the thoroughness of her review of Walsh Senior Project Manager Mark Fournier's deposition before she issued her report, her passing reference to Fournier's deposition in her declaration is not so contradictory to her deposition as to warrant excluding or striking her declaration or reports altogether. For all these reasons, Walsh's motion to exclude is denied.

## II.    Breach of Contract

In Counts I–IV, Walsh alleges that Lexington breached the Policy by failing to cover the entirety of the amounts claimed. The construction of an insurance policy and a determination of the rights and obligations thereunder are questions of law for the court which are appropriate subjects for disposition by summary judgment. *Travelers Ins. Co. v. Eljer Mfg., Inc.*, 197 Ill.2d 278, 292 (2001); *Crum & Forster Managers Corp. v. Resolution Tr. Corp.*, 156 Ill.2d 384, 391 (1993). In construing the policy language, the primary objective "is to ascertain and give effect to the intention of the parties, as expressed in the policy language." *Sproull v. State Farm Fire & Cas. Co.*, 2021 IL 126446, ¶ 19. To determine the meaning of the policy language and the parties' intent, the court must construe the policy as a whole, taking into account the type of insurance purchased, the subject matter, the risks undertaken and purchased, and the overall purpose of the contract. *Travelers Ins.*, 197 Ill.2d at 292; *Crum &*

13

*Foster*, 156 Ill.2d at 391. Lexington moves for summary judgment arguing that it did not breach the Policy when it refused to fully pay the McCook 2 and 3 Claims because the loss to the Dome and the Expediting Expenses and Extra Expenses were not covered by the Policy.

### A. Dome Loss

In Count II, Walsh alleges that Lexington was obligated to cover the costs of repairing and reinforcing the Dome. An all-risk policy, such as the Policy here, is one "that covers all 'fortuitous' losses except for those specifically excluded in the policy language." *Terraces Condo. Ass'n v. Ins. Co. of Greater N.Y.*, No. 19-CV-6028, 2022 WL 847478, at *3 (N.D. Ill. Mar. 22, 2022). "[T]o withstand an insurer's motion for summary judgment on an insured's coverage claim under an all-risk policy, the insured must establish a *prima facie* case that: (1) a loss occurred; (2) the loss resulted from a fortuitous event; and (3) the policy was in effect at the time of the loss." *Id.* (citing *Gulino v. Econ. Fire & Cas. Co.*, 2012 IL App (1st) 102429, ¶ 16; *Harbor House Condo. Ass'n v. Mass. Bay Ins. Co.*, 915 F.2d 316, 318 (7th Cir. 1990)). The Illinois Court of Appeals has explained what makes an event fortuitous:

> "Fortuitous" means happening by chance or accident, or occurring unexpectedly or without known cause. Black's Law Dictionary 664 (7th ed. 1999). The Restatement of Contracts defines a fortuitous event as an event that, as far as the parties are aware, is dependent on chance. Restatement of Contracts § 291, Comment A (1932); *see Bd. of Educ. of Maine Twp. High School Dist. 207 v. Int'l Ins. Co.*, 292 Ill. App. 3d 14, 18 (1997). The determination of whether a loss is fortuitous is a legal question for the court to determine. *Mattis v. State Farm Fire & Casualty Co.*, 118 Ill. App. 3d 612, 621 (1983). "An all-risk policy covers only those losses that were actually *risked* by the parties. A loss that was, so far as the parties knew, an inevitable certainty at the time of contracting is not fortuitous and will not be covered by the resulting

14

contract." *Crete-Monee Sch. Dist. 201-U v. Ind. Ins. Co.*, No. 96 C 0275, 2000 WL 1222155, at \*4 (N.D. Ill. Aug. 22, 2000) (citing *Mattis*, 118 Ill. App. 3d at 621).

*Johnson Press of Am., Inc. v. N. Ins. Co. of N.Y.*, 339 Ill. App. 3d 864, 872 (2003) (cleaned up and modified) (emphasis original). If the insured establishes its *prima facie* case, then the burden shifts to the insurer "to affirmatively demonstrate that the loss resulted from a peril expressly excluded from coverage." *Gulino*, 2012 IL App (1st) 102429, ¶ 16.

First, Lexington argues that a loss did not occur because the Dome was not damaged by a "Flood" as defined in the Policy. The Policy defines Flood to include "the rising, overflowing or breaking of boundaries of natural or manmade bodies of water." R. 1-1 at 18, ¶ 4. Here, the Des Plaines Tunnel is constructed to collect CSO, making it a boundary of a man-made body of water. The Dome is a part of that boundary. The Dome allegedly broke due to the rising of CSO in the Des Plaines Tunnel. Therefore, the damage to the Dome was caused by a Flood as defined in the Policy.[6]

Lexington contends that there is no evidence that the Dome was, in fact, damaged by water pressure build-up in the Des Plaines Tunnel and that Walsh did not investigate the cause of the hole. But there is evidence that no hole existed before February 2, 2019; CSO levels in the Des Plaines Tunnel began to rise on February 2,

---

[6] Walsh, for the first time in its response brief, claims coverage resulting from "Water Damage" as defined in the Policy. Yet Walsh's complaint says nothing about "Water Damage" and its arguments on summary judgment about such coverage are underdeveloped. But because the Court finds a Flood occurred, it need not also decide whether there was Water Damage.

2019; that workers saw CSO on the face of the Dome; that, after evacuating the Walsh Tunnel, the dewatering pumps continually pumped out water from February to May; and that after two weeks of heavy rainfall in early-May 2019 Walsh workers could look down the shaft and see that the Walsh Tunnel was filled with CSO. These facts would allow a jury to reasonably infer that the hole in the Dome was caused by the pressure build-up in the Des Plaines Tunnel and that the hole allowed CSO to flow into the Walsh Tunnel.[7]

Lexington further contends that because Walsh has not shown that the breaking of the Dome came from a flood on the Walsh Tunnel side, it is not covered by the Policy. But that is not what the Policy says or what the parties intended. Lexington does not dispute that the Dome is insured property, and the Policy makes no distinction about which direction the cause of the damage must come to be covered by the Policy.

Next, Lexington argues that there was no fortuitous event because the chance that the Des Plaines Tunnel would flood during heavy rains is an expected occurrence—indeed the Des Plaines Tunnel was designed to accept excess CSO. While the Court does not disagree that the buildup of CSO in the Des Plaines Tunnel is not fortuitous, the rupturing of an eighteen-foot-thick cement structure that was specifically designed to keep CSO contained to the Des Plaines Tunnel so that it acted

---

[7] In a footnote, Lexington also alludes to a Walsh worker, sometime before the February Flood, attaching a steel plate to a hole in the Dome. R. 35 at 10 n.4. To the extent Lexington is arguing that the hole Walsh discovered when it reentered the Walsh Tunnel is the same hole, there is no evidence to support that argument.

16

as an enclosed system is fortuitous. The breaking of the Dome resulting in CSO entering the Walsh Tunnel while Walsh was constructing the tunnel was not something that was actually risked by either party nor an inevitable certainty at the time of the Policy.

Lexington also argues that the costs associated with reinforcing the Dome were not fortuitous, but rather the result of a business decision. *See Univ. of Cincinnati v. Arkwright Mut. Ins. Co.*, 51 F.3d 1277, 1282 (6th Cir. 1995) (holding that the costs to remove asbestos from a building, known to contain asbestos at the time the policy was purchased, before demolition were not covered by the all-risk policy because the University made the business decision to remove the building and the asbestos removal costs were not unexpected). The contract between Walsh and MWRD states: "The Contractor is advised that a temporary dam may be required to be installed upstream of the connection to keep the area dry when making the live connection." R. 34-1 at 96. Walsh's Project Manager, Brian Fidoruk, explained that it was a "requirement" that Walsh "needed to isolate the reservoir and the Des Plaines tie-ins from the gate shaft." *Id.* at 57. Before the February Flood, the plan was to line the Walsh Tunnel with concrete, remove the Dome, and then construct a bulkhead just south of the gate shaft so this area was protected from potential flooding while the gates were being installed. *Id.* However, after the February Flood, Walsh decided to build the bulkhead onto the Dome as a means to repair and reinforce the Dome, and then line the Walsh Tunnel with concrete. *Id.* At this point in the project, and only because of the February Flood, Walsh needed to repair the Dome to resume contract

17

work. Thus, the reinforcement of the Dome and the associated costs were not the result of a voluntary business decision, but instead the result of a fortuitous event. For all these reasons, Lexington's summary judgment motion as to Count II is denied.

### B.    Expediting Expenses

Next, in Counts I and III, Walsh alleges that Lexington breached the Policy by refusing to cover the claimed Expediting Expenses. Recall that the Expediting Expense clause states:

> [I]n the event of direct physical loss or damage insured hereunder and occurring during the policy period, the Company will pay for the reasonable extra costs to make temporary repairs and to expedite the permanent repair or replacement of the insured property which is damaged by an insured peril, including additional wages for overtime, night work, and work on public holidays and the extra costs of express freight or other rapid means of transportation.

R. 1-1 at 11, ¶ 3.C.(1).

This provision refers to costs, including wages, incurred to make repairs and to expedite permanent repairs or replacement of insured property in the event of loss covered by the Policy. First, Walsh claims that it is owed the Expediting Expenses incurred to repair the Dome. R. 34-1 at 570. The reinforcement of the Dome was a "temporary" or "permanent" repair due to an insured peril, *i.e.*, a Flood. Thus, those associated costs are covered by the Policy. Walsh also argues that, in relation to the December Flood, its claim for Expediting Expenses includes overtime it actually incurred to expedite repairs that were not paid. R. 42 at 19–20; R. 43-8 at 77; R. 48 ¶ 28. Lexington contends such costs were paid. R. 50 at 5; *see also* R. 34-1 at 409; R. 48-1 ¶¶ 12, 14. These disputes make summary judgment inappropriate.

18

However, when Walsh submitted its claims to Lexington, it described its Expediting Expenses as "Acceleration to Recover Schedule After Dome Repair." R. 44 ¶ 73 n.5. Walsh explained the Expediting Expenses as estimates of the overtime costs it would incur for 24 workers (8 operators and 16 laborers) working 8-hour shifts to recover time for the 272 days it was unable to perform contract work on the Walsh Tunnel. *Id.* ¶ 73. Walsh admits that its Expediting Expense claims were, at least in part, "estimates of overtime costs Walsh would incur once it was able to gain access to the [Walsh] Tunnel in order to make up for the lost time, not actual costs incurred." *Id.* ¶ 74. However, the language of the Expediting Expense provision says nothing about acceleration costs or costs to recover lost time being included; the provision speaks only to costs incurred to make repairs. Therefore, to the extent Walsh's Expediting Expense claims consist of costs that were never incurred and/or premised on making up lost time with no relation to repairing or replacing insured property, they are not covered by the Policy.

Next, Walsh argues that the Expediting Expense provision is not contingent on the status of the project's progress and that Lexington's denial of Expediting Expenses improperly rested on "acceleration" costs, *i.e.*, the costs needed to bring the project back up to schedule to before the alleged loss. But it was Walsh, not Lexington, that injected "acceleration" into the claims. Lexington, in denying the claims, was merely responding to what was submitted by Walsh.

Walsh further argues that, in relation to the February Flood, its claim for Expediting Expenses includes extra equipment costs incurred to expedite repairs. R.

42 at 20; R. 48 ¶ 28. Specifically, Walsh contends that it purchased a $60,000 150-horsepower dewatering pump that could remove CSO quicker so that contract work could resume. *See* R. 43-3 at 206–07; R. 43-14 at 116–17. However, Walsh points to no evidence indicating that this cost was included in its Expediting Expense claim to Lexington. In sum, it appears Walsh's Expediting Expense claim includes costs associated with repairing the Dome and overtime to make repairs after the December Flood, which are covered by the Policy, and costs to recover lost time, which are not covered by the Policy. For this reason, the Court denies in part summary judgment on Counts I and III.

C. Extra Expenses

Count IV asserts a breach of contract claim against Lexington for its denial of coverage for Extra Expenses. The Extra Expenses provision provides that:

> [I]n the event of direct physical loss or damage insured hereunder and occurring during the policy period, the Company will pay for the reasonable and necessary Extra Expense which is incurred by the Insured for the purpose of continuing as nearly as practicable the scheduled progress of undamaged work, but only when such scheduled progress is impaired by direct physical loss or damage by an insured peril to the insured property.
>
> (c) "Extra Expense" shall be defined as the excess costs over and above the total costs that would normally have been incurred to continue the scheduled progress of the undamaged work in the absence of insured loss or damage.
>
> (d) "Extra Expense" shall include reasonable and necessary labor, supervision, management and administration costs, equipment rental, temporary use of property and demobilization and remobilization of equipment and facilities, all when necessarily incurred to reduce time delays in the contract schedule.

20

> It is a condition precedent to recovery hereunder that the Named Insured shall use due diligence and shall do and concur in all things necessary to maintain the scheduled progress of the undamaged work which existed immediately prior to insured loss or damage covered by this Policy.

R. 1-1 at 11, ¶ 3.C.(2). Thus, to recover Extra Expenses, the insured peril—a Flood—must have impaired the scheduled progress of the project and caused Walsh to incur the claimed Extra Expenses that were necessary to try to maintain the scheduled progress or reduce time delays.

Walsh's Extra Expense claim consists of costs to keep field supervisors and idle equipment on site during the eight-month period Walsh was unable to perform contract work. R. 44 ¶ 70. Walsh contends these costs were necessarily incurred to try to keep the project on schedule and mitigate further delay so that Walsh was ready to go once contract work could resume. *Id.* ¶¶ 68, 70. Lexington argues that Walsh would have incurred these claimed costs even if no Flood had occurred because the McCook Project was already significantly delayed before the February Flood. Specifically, in the absence of either Flood, Lexington contends that Walsh would have had eleven months of downtime because it had to wait for the gates to be delivered. Walsh had contracted to purchase a gate system from Linita Design & Manufacturing ("Linita"). R. 34-1 at 41. After the gate system had been made with nondomestic steel, Linita sought a waiver from the MWRD under the Illinois Steel Products Procurement Act which requires domestic steel to be used. *Id.*; R. 44 ¶ 20. But the MWRD ultimately denied Linita's request, which forced Linita to remake the entire gate system. *Ibid.*

21

Before the February Flood, Walsh was aware that the delivery of the gates would be delayed due to the MWRD's denial of the domestic steel waiver. R. 44 ¶ 20. However, the evidence and the parties' arguments are unclear on when Walsh first learned of the need to refabricate and how significantly that impacted the schedule at that time. Regardless, on February 13, 2019, Walsh received a report from Linita indicating that the gates were scheduled to be delivered by May 1, 2020 and June 12, 2020. R. 48 ¶ 26. Thus, the evidence suggests that, as of February 2019, Walsh was scheduled to complete the McCook Project by September 2020. *See* R. 48 ¶¶ 26, 30–31; R. 43-14 at 161.[8] But the gates were not delivered until May 19, 2021 and June 17, 2021. R. 44 ¶ 59.

The parties dispute what caused the gates' delivery to be further delayed. Walsh contends that it asked the fabricator to delay the delivery because work on the Walsh Tunnel was halted due to the flooding and Walsh could not accept delivery of the gates a year or six months early. *See* R. 48 ¶ 29; R. 43-13 at 161–63. Lexington argues that the delay was due to the refabrication and that Walsh's Mark Fournier was actually pressing Linita for delivery. *See* R. 48 ¶¶ 29, 31; R. 48-2. Additionally, Lexington's expert, Rachel Domingo, opines that the McCook Project was already behind schedule due to the procurement issues of the gates rather than the flooding. R. 34-1 at 683–84. The parties also dispute the exact date the alleged loss occurred.

---

[8] Lexington disputes this, claiming that installation of the gates in May 2020 "was an impossibility" as Linita was unable to deliver the gates until spring of 2021. However, this contention is premised on a September 4, 2020 letter that postdates the February Flood and does not reflect what was known at the time of the February Flood. *See* R. 48-2 at 26–27.

Walsh contends the loss occurred on February 2, 2019, while Lexington contends it occurred on April 30, 2019. These disputes of material fact make summary judgment inappropriate because a reasonable jury could find that the delayed delivery of the gates was due, even in part, to the February Flood. And questions remain about when the loss occurred and what the schedule was at those points in time. Accordingly, Lexington's motion for summary judgment is denied as to Count IV.

## III.    Bad Faith

Lastly, in Count V, Walsh alleges that Lexington acted in bad faith in partially denying the McCook 3 Claim. Section 155 of the Illinois Insurance Code states:

> (1) In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:
>
>> (a) 60% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;
>>
>> (b) $60,000;
>>
>> (c) the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action.

215 ILCS 5/155.

Section 155 provides "an extracontractual remedy to policy-holders whose insurer's refusal to recognize liability and pay a claim under a policy is vexatious and unreasonable." *Phillips v. Prudential Ins. Co. of Am.,* 714 F.3d 1017, 1023 (7th Cir.

23

2013) (quoting *Cramer v. Ins. Exch. Agency*, 174 Ill.2d 513, 519 (1996)). Sanctions under Section 155 require "that the insurer's behavior was willful and without reasonable cause." *Citizens First Nat'l Bank v. Cincinnati Ins. Co.*, 200 F.3d 1102, 1110 (7th Cir. 2000). Courts consider the totality of the circumstances to determine whether an insurer's conduct violates Section 155. *See Golden Rule Ins. Co. v. Schwartz*, 203 Ill.2d 456, 469 (2003). An insurer who "misrepresents facts, denies coverage after refusing to conduct an adequate investigation, and bases its decision upon speculation or incomplete information could be considered to have acted without reasonable cause." *Markel Am. Ins. Co. v. Dolan*, 787 F. Supp. 2d 776, 779 (N.D. Ill. 2011).

Further, "an insurer's conduct is not vexatious and unreasonable if: (1) there is a bona fide dispute concerning the scope and application of insurance coverage; (2) the insurer asserts a legitimate policy defense; (3) the claim presents a genuine legal or factual issue regarding coverage; or (4) the insurer takes a reasonable legal position on an unsettled issue of law." *Citizens First*, 200 F.3d at 1110 (citations omitted). If the facts demonstrate a bona fide dispute regarding coverage—meaning a dispute that is "real, actual, genuine, and not feigned"—then sanctions under Section 155 are inappropriate. *Am. States Ins. Co. v. CFM Const. Co.*, 398 Ill. App. 3d 994, 1003 (2010); *see also Med. Protective Co. v. Kim*, 507 F.3d 1076, 1087 (7th Cir. 2007) ("[A] bona fide dispute regarding coverage . . . is all Illinois law requires to avoid the imposition of [Section 155] penalties.").

Here, Lexington hired experts to assist in its evaluation of Walsh's claims, and Lexington's investigation into the claims included meetings and conference calls with Walsh. R. 44 ¶¶ 75–76. Lexington also requested documents from Walsh. *Id.* ¶ 77. Ultimately, Lexington paid portions of Walsh's claims while denying coverage for other portions. *Id.* ¶ 78. No reasonable jury could find, on these facts, that Lexington acted in bad faith.

Furthermore, the evidence suggests there is a bona fide dispute regarding the date of loss. Lexington argues that although the Walsh Tunnel was evacuated on February 2, 2019, there was only seepage of CSO present and no flooding. Lexington contends there are documents as late as April 22, 2019 which confirm only "minor seepage." *See id.* ¶¶ 41, 44. Lexington argues that this seepage cannot be deemed a Flood under the Policy. Additionally, when Walsh first submitted its claim it listed May 13, 2019 as the date of loss but then amended it to February 2, 2019. *Id.* ¶¶ 46–47. To resolve that discrepancy, Lexington and its experts reviewed rainfall data and other documentation and ultimately determined that April 30, 2019 was the earliest date the Walsh Tunnel flooded. *See* R. 1-3 at 5; R. 34-1 at 402; R. 35 at 21. Thus, Lexington contends that the date of loss is not February 2, 2019, as Walsh alleges, but instead April 30, 2019, which represents a bona fide dispute. For these reasons, summary judgment is granted on Count V.

### Conclusion

For the foregoing reasons, Walsh's motion to exclude the declaration and reports of Rachel Domingo is denied. Further, Lexington's motion for summary

judgment is granted as to Count V and denied as to Counts I–IV.

ENTERED:

_Thomas M Durkin_

Honorable Thomas M. Durkin
United States District Judge

Dated: April 28, 2026

26